IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HEALTHCARE SERVICES GROUP, INC. :       CIVIL ACTION
                                 :
                v.               :
                                 :
TIMOTHY FAY, et al.              :       NO. 13-66

MEMORANDUM

Bartle, J.                                      May 22, 2013

        Plaintiff Healthcare Services Group, Inc.

("Healthcare") has sued Timothy Fay ("Fay"), Richard Konopka

("Konopka"), and The Senova Group ("Senova")[1] for breach of

employment contracts, misappropriation of trade secrets under 12

Pa. Cons. Stat. Ann. § 5301 et seq., tortious interference with

business relations, and tortious interference with contractual

relations.  Fay and Konopka are former employees of Healthcare

and are now working for Senova.

        We have subject matter jurisdiction under 28 U.S.C.

§ 1332(a).[2]  Before the court is the motion of Healthcare for

_____

1.  According to its answer, The Senova Group is a fictitious
name for Janova Healthcare Services, LLC ("Janova"), a Delaware
limited liability company transacting business and maintaining a
regular place of business in New York City.

2.  Healthcare is incorporated and has its principal place of
business in Pennsylvania.  Fay is a citizen of New York, and
Konopka is a citizen of Connecticut.  As noted above, Senova is a
fictitious name for Janova, which is incorporated in Delaware
with its principal place of business in New York.  The sole
member of Janova is Lenova Holdings, LLC, a Delaware limited
liability company with its principal place of business in New
                                            (continued...)

preliminary injunctive relief.  The court held an evidentiary
hearing on the motion and now makes the following findings of
fact and conclusions of law.

I.

Healthcare provides contract food service, dining,
housekeeping, and laundry services to clients operating senior
living facilities and nursing homes in 49 states.  Fay was a
Senior District Manager at Healthcare, and Konopka was a Regional
Manager.  In 2010, 2011, and 2012, in exchange for the right to
purchase Healthcare's stock at a discount, Fay and Konopka
executed employment agreements which prohibited them from
competing with Healthcare for a two-year period in the
continental United States, soliciting Healthcare customers for a
period of eighteen months, soliciting clients on accounts for
which Fay or Konopka were responsible for a period of two years,
or accepting employment related to housekeeping, linen, and/or
food services by any facilities in which they worked for a period
of two years.  Healthcare alleges that Fay and Konopka breached
the following covenants in their employment agreements:

> **A. Covenant Not to Compete**.  During the term
> of your employment, and for a period of
> twenty-four (24) months after your employment
> has terminated, for any reason, you will not,
> either solely or jointly with, or as manager
> or agent for, any person, corporation, trust,

---

2.  (...continued)
York.  The sole member of Lenova Holdings, LLC is Novack
Corporation, a California corporation with its principal place of
business in California.  The amount in controversy exceeds the
sum of $75,000, exclusive of interest and costs.

joint venture, partnership, or other business entity, directly or indirectly, carry on or be engaged or interested in (whether as employee, sole proprietor, partner, consultant, or owner,) any housekeeping, laundry, linen, and/or food service business, in any form whatsoever, which services health care institutions within the continental United States.

**B. Covenant Not to Solicit Clients or Accounts**.  For a period of eighteen (18) months after your employment has been terminated, for any reason, you will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, solicit or accept any housekeeping, laundry, linen, and/or food service business or any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the Company within eighteen (18) months, of your separation from the Company (this covenant shall not apply to Account Managers).

**C. Covenant Not to Solicit Clients or Accounts For Whom You Were Responsible**.  For a period of two (2) years after your after your employment has been terminated, for any reason, you will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, solicit or accept any housekeeping, laundry, linen, and/or food service business or any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the Company within two (2) years of your separation from the Company, for any reason, and for whom you were responsible.

**D. Cross-Over Employment Covenant**.  At no time during your employment, and for a period of two (2) years after your employment has terminated, for any reason, you will not accept any employment related to housekeeping, laundry, linen, and/or food services by any facilities in which you worked, or were directly responsible for, within business of any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the

Company within two (2) years of your
separation from the Company, regardless of
any changes of ownership or affiliation of
such facilities.
**E. Employment by Competing Contractors**
**Covenant.**  At no time during your employment
or for a period of two (2) years after your
employment has terminated, for any reason,
will you accept any employment related to
housekeeping, laundry, linen, and/or food
services at any facility in which you have
worked, or been directly responsible for,
within two (2) years of your separation from
the Company.  You acknowledge that this
provision, when combined with Paragraph ... D
above, may restrict your future employment,
regardless of whether that employment is by:
(1) the facility itself; (2) an entity that
owns, operates, or manages the facility; (3)
another contractor; and (4) self-employment
by you as an independent contractor.[3]

Fay and Konopka resigned their positions with

Healthcare on September 6, 2012 and October 10, 2012,

respectively.  Each informed Kevin McCartney, Divisional Vice

President for Healthcare's Northeast Division, that he was

accepting employment with Senova.  They told McCartney that their

employment activities for Senova would be limited to Senova's

commercial business, as opposed to its healthcare business, and

that they would therefore be in compliance with the restrictive

covenants in their employment agreements.

Fay had been employed at Healthcare for ten years.  As

a Senior District Manager, he was responsible for its operational

performance in a number of senior living facilities with which it

had contracts.  His duties included overseeing Healthcare's

---

3.  The restrictive covenants in those employment agreements were
identical for 2010, 2011, and 2012.

budgets and financials, including its profit margins, at these locations.  While he did not have direct sales responsibilities, he would pass along any helpful information learned in his operational capacity to those employees with sales responsibilities.  He would also go to four or five sales meetings each year.  His territory included facilities mainly in New York but also a few in Connecticut.

Konopka had worked at Healthcare for twelve years.  As a Regional Manager, he was involved in customer contact and marketing in New York and Connecticut.  He participated in sales visits to potential clients and knew which facilities Healthcare was trying to develop as clients.

Healthcare's sales team acquires accounts through some cold-calling but mostly through its relationships with its current clients.  For example, when an administrator at one client leaves for another healthcare facility, Healthcare tries to continue the relationship with the administrator and do business with the new facility.  In a first contact with a potential client, someone from Healthcare obtains information on how the potential client is currently operating and then walks through the facility with the administrator to discuss how Healthcare would change operations.  When Healthcare is unsuccessful in the attempted solicitation of a potential client, it will try to solicit the potential client again in three to six months.  Records are kept of these attempts, and all district managers and regional managers have access to these records.

These records also contain information about the decisionmakers at various facilities.  This kind of information is valuable because it helps Healthcare to streamline its sales process.  Nonetheless, a diligent person could search the phonebook or internet for a list of healthcare facilities in a region and call those facilities to determine who makes decisions regarding cleaning, laundry, and dining services at each.  Similar information is also available in government records because healthcare facilities submit cost reports to the various states where they are located regarding how much they spend annually by department.

Healthcare's purpose in requesting high level employees such as Fay and Konopka to sign restrictive covenants is to prevent such individuals from using their knowledge of Healthcare's systems and procedures to solicit both existing Healthcare clients and potential Healthcare clients for a competitor.  These systems and procedures include budget, financing, and marketing information, as well as methods used to make its services efficient and profitable.  Healthcare markets itself to potential clients as having a unique cleaning system that is more efficient than that of its competitors.  This cleaning system is written down and distributed to the employees who do the cleaning.  Healthcare also markets itself to potential clients by entering contracts that allow clients to cancel its services within sixty to ninety days.  Although Healthcare attempts to keep its contracts with clients confidential, anyone,

including Senova employees, could seek to obtain a copy of the contract from the Healthcare client.

Konopka and Fay both told Senova's Chief Operating Officer, Mordy Levy, about the restrictive covenants they had signed with Healthcare before they were hired by Senova. Nonetheless, Konopka was hired to be the Vice President of Marketing at Senova at a salary of $150,000 per year.  Despite his title and salary, he does not now have sales responsibilities and is currently acting as an operations manager to help Senova make its healthcare operations more competitive in the industry.

Konopka explained that his current duties at Senova simply involve visiting two of Senova's long-term care facility clients, to ensure that they are clean, that the administrators are happy, and that the Senova managers at the facilities are doing their jobs.  When he first was employed by Senova, its sales person, Sam Hartstein ("Hartstein"), reported to Konopka. They would discuss sales and operations, although they rarely saw each other because they each spent most of their time traveling to clients and potential clients.  Their collaboration was over the phone.  Hartstein left Senova on April 17, 2013.

When Fay was hired, he was under the impression that he would oversee managers at a number of healthcare facilities. Although his salary is $125,000 per year, he testified that he is responsible for the management of only two healthcare facilities on a regular basis, Notre Dame Convalescent Home ("Notre Dame") in Norwalk, Connecticut and Livingston Hills Nursing and

-7-

Rehabilitation Center in Hudson, New York and for fielding occasional questions, via telephone, from a facility in California.  Fay only spends four hours each day at any facility. The rest of his work day is spent driving to and from them.  Fay also supervises John Kalba, a manager at Senova who also came from Healthcare, where he was an account manager.

Fay admits that on one occasion as a Senova employee he accompanied Hartstein to a place of business of one of Healthcare's clients, Glengariff Healthcare Center ("Glengariff") on Long Island, New York.  Healthcare's contract with Glengariff only involved dietary services, which Senova does not provide. Hartstein was there to make a proposal to Glengariff for Senova to perform its cleaning services.  According to Fay, he went to Glengariff simply to talk to the owner of the nursing home, Sanjay Ahuja ("Ahuja"), who also owned a cleaning supply business.  Fay was interested in buying cleaning supplies from Ahuja for Senova and simply discussed this subject with him. Even if Fay was not present when Hartstein discussed with Ahuja the possibility of Glengariff using Senova's cleaning services, part of sales is forming goodwill with potential clients, which is what Fay did here.  Moreover, although Senova could not have captured Healthcare's dietary business, Fay's visit to Glengariff served to undermine any effort on the part of Healthcare to obtain a contract for Glengarrif's cleaning business.  When Fay was at Glengariff, he saw Jen Andross, a former coworker from

Healthcare, in the parking lot.  Speaking with her, he said, "hey don't tell your boss I'm here."

Fay and Konopka admit that they were involved in discussions with another customer of plaintiff, West Hartford Health and Rehabilitation Center ("West Hartford") in Connecticut.  Konopka visited West Hartford because Hartstein had a meeting there and asked Konopka to accompany him.  Fay also attended the meeting.  Hartstein presented the sales proposal while Fay and Konopka were in the room.  While Konopka apparently had not reviewed the proposal, he knew the two administrators to whom Hartstein was presenting the proposal from his time at Healthcare.  Konopka was the person at Healthcare who had initiated Healthcare's relationship with West Hartford in 2011.  Sometime after this meeting that Hartstein, Fay, and Konopka attended at West Hartford, Healthcare was forced to reduce the price of its contract with West Hartford by $30,000 in order to keep it as a client.

In addition to Glengariff and West Hartford, Fay testified that he went to a few other sales meetings while at Senova but stated that he could not recall the names of those facilities.  According to Fay, none was a current client of Healthcare.

Since Fay and Konopka have been at Senova, Senova has also obtained a new client, Notre Dame, which Konopka had unsuccessfully solicited when he was at Healthcare.  Hartstein solicited Notre Dame for Senova.

After Fay and Konopka left to work for Senova,
Healthcare shored up its client relationships because it wanted
to ensure that Senova did not take any of its clients.  Indeed, a
number of Healthcare's clients in New York and Connecticut called
Healthcare after Fay and Konopka left for Senova.  All staff had
meetings and contacts with existing clients to see if they had
been contacted by Senova.  This took time away from the usual
business of the Healthcare sales and marketing team, which would
ordinarily include soliciting new business.

                                II.

Healthcare requested the following specific relief in
its motion for a preliminary injunction:  (1) to enjoin Fay,
Konopka, and Senova from using or disclosing any of Healthcare's
trade secrets or confidential or propriety business information;
(2) to enjoin Fay and Konopka from contacting, directly or
indirectly, any person or entity that was a client of Healthcare
while they worked there; (3) to enjoin Fay and Konopka from
accepting or maintaining employment with, or providing services
to or on behalf of, any competitor of Healthcare, including
Senova; and (4) to enjoin Senova from continuing to employ Fay
and Konopka.

At the hearing, Healthcare explained that it was simply
requesting the preliminary injunction against Fay and Konopka in
connection with its breach of contract claim.  It was not
pressing at this time its request to have Senova enjoined from
using or disclosing any of Healthcare's trade secrets or

                                -10-

confidential or propriety business information.  As to its request to enjoin Senova from continuing to employ Fay and Konopka, it viewed it simply as the inverse of its request to enjoin Fay and Konopka from working at Senova.

Fay and Konopka have agreed to be enjoined from using any of Healthcare's confidential and/or proprietary information[4] and from directly or indirectly contacting or soliciting any known customers of Healthcare until June 16, 2014.  However, they oppose any injunction which would prevent their employment with Senova or any competitor of Healthcare for any period of time.

III.

Healthcare has the burden of persuasion, by a clear showing, since a preliminary injunction is a drastic remedy.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotation marks and citation omitted).  To be enforced, a covenant not to compete must be "reasonably necessary for the protection of the employer's protectible [sic] business interests.'"  Hess v. Gebhard & Co., Inc., 808 A.2d 912, 920 (Pa. 2002).

---

4.  While Fay and Konopka have agreed to be enjoined from using any of Healthcare's confidential information, Rule 65(d)(1) of the Federal Rules of Civil Procedure requires any injunction to "state its terms specifically" and "to describe in reasonable detail the... act or acts restrained...."  There was no specific evidence in the record on the subject of confidential information.  Moreover, Healthcare is not pursuing at this time preliminary injunctive relief under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. Ann. § 5301 et seq.

A preliminary injunction should be granted only if the plaintiff can establish:  "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  A preliminary injunction is inappropriate if the plaintiff fails to establish any element in its favor.  P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005).

To establish a likelihood of success on the merits, the restrictive covenants must be enforceable.  In Pennsylvania, valid restrictive covenants must be incident to the employment relationship, reasonably necessary for the protection of the employer, and reasonably limited in duration and geographic extent.  Hess, 808 A.2d at 917; see also Zambelli Fireworks Mfg. Co., v. Wood, 592 F.3d 412, 424 (2010).  At the evidentiary hearing, the defendants agreed that the employment agreements are supported by consideration and are valid.  Defendants have also conceded that they have breached their employment contracts by going to work for Senova, a competitor of Healthcare. Accordingly, Healthcare must only establish that it will suffer irreparable harm if the preliminary injunction is denied, that granting the preliminary injunction will not result in greater

harm to Konopka and Fay, and that the public interest favors such relief.

The Pennsylvania Supreme Court explained the standard for irreparable harm in the context of a covenant not to compete in an employment agreement in <u>John G. Bryant Co. v. Sling Testing & Repair, Inc.</u>, 369 A.2d 1164, 1167 (Pa. 1977).  The court provided:

> It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.... The covenant seeks to prevent more than just the sales that might result by the prohibited contact but also the covenant is designed to prevent a disturbance in the relationship that has been established between [the employees] and their accounts through prior dealings.  It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.

Accordingly, in Pennsylvania, "interference with customer relationships satisfies the irreparable harm requirement." <u>Coventry First, LLC v. Ingrassia</u>, No. 05-2802, 2005 U.S. Dist. LEXIS 13759 (E.D. Pa. July 11, 2005) (citing <u>John G. Bryant Co.</u>, 369 A.2d at 1167).  "Indeed, as one court has stated, 'because the violation of a covenant not to compete results in interference with customer relationships causing nonquantifiable damages, such covenants are prima facie enforceable in equity.'"  <u>Id.</u> (quoting <u>Sparks Tune-Up, Inc. v.</u>

-13-

White, No. 89-664, 1989 U.S. Dist. LEXIS 4216, at *4 (E.D. Pa. Apr. 18, 1989)).

Fay and Konopka urge that we follow Advanced Fox Antenna v. Csaszar, No. 98-5626, 1999 U.S. Dist. LEXIS 1218 (Jan. 29, 1999).  There, the defendant had signed an employment agreement with the plaintiff which included a covenant not to compete as well as a covenant not to solicit clients of the employer or use the employer's confidential information.  Id. at *2.  The defendant quit her job with the plaintiff and accepted a new job with a competitor.  Id. at *3.  The plaintiff sued and moved for a preliminary injunction prohibiting the defendant both from working at the competitor and from soliciting the plaintiff's clients or using the plaintiff's confidential information in any way.  Id.  The court granted the motion in part and enjoined the defendant from soliciting her former employer's clients or disclosing her former employer's confidential information but denied it in part by refusing to enjoin her from working at a competitor.  Id. at *13.

Fay and Konopka would like us to follow Advanced Fox Antenna and simply enjoin them from soliciting Healthcare's clients or using Healthcare's confidential information while allowing them to continue to work at Senova.  However, the situation here is different from that in Advanced Fox Antenna.  There, the plaintiff had offered no evidence that the defendant had either solicited its customers or disclosed any confidential information to her new employer.  In contrast, Fay and Konopka

concede that they attended meetings at clients of Healthcare with
a member of Senova's sales team.  While Fay and Konopka contend
that these meetings do not constitute solicitation of
Healthcare's clients, we disagree.  By going to sales meetings at
the clients of Healthcare, whom they knew from their work there,
Fay and Konopka were clearly establishing goodwill for Senova, a
key component of solicitation.

        Similarly, Fay and Konopka also rely on <u>Rollins</u>
<u>Protective Services Co. v. Shaffer</u>, 383 Pa. Super. 598 (Pa.
Super. Ct. 1989).  There, the Superior Court upheld the denial of
a preliminary injunction when employees with employment
agreements containing covenants not to compete went to work for a
competitor of the plaintiff, which, like plaintiff, was a
security company.  <u>Id.</u> at 602.  The court held that the
defendants failed to prove that there was a threat of irreparable
harm because they had not proven any unwarranted interference
with customer relations.  <u>Id.</u>  The present case is inapposite
since the plaintiff established at the hearing that Fay and
Konopka both went to sales meetings at clients of Healthcare,
thus interfering with Healthcare's customer relations.

         This was also the situation in <u>Harsco Corp. v. Klein</u>,
576 A.2d 1118 (Pa. Super. Ct. 1990), on which the defendants
rely.  There, the defendant worked at plaintiff's subdivision,
Patent Scaffolding Company, as the national sales manager.  <u>Id.</u>
at 1119.  Patent Scaffolding Company was in the business of
marketing concrete shoring and forming scaffolding systems and

related products and services.  Id.  The defendant had signed a
covenant not to compete in an employment agreement.  Id. at 1120.
He left Patent Scaffolding Company to work for The Burke Company,
which was in direct competition with Patent Scaffolding Company
in the Pittsburgh area.  Id.  The court found that irreparable
harm had not been proven because there was no uniqueness in the
former employee's product or services that could be characterized
as confidential.  Id. at 1121.  Further, the employee did not
deal directly with customers at the time he resigned from his
former employer, and the customers in the building trade are
known to all.  Id.

          Fay and Konopka likewise argue that "[t]here are no
scientific or revolutionary processes involved" in Healthcare's
business, which consists of cleaning bathrooms, common areas and
resident/patient rooms, buying and preparing food for mass
distribution, washing clothes, and changing beds.  However,
unlike the defendant in Harsco, Fay and Konopka were high level
employees who worked directly with clients when they were at
Healthcare.  Furthermore, Healthcare has established that Fay and
Konopka, while at Senova, met with clients of Healthcare, to its
detriment.  While its business is perhaps not highly scientific,
Healthcare does market itself to potential clients on the basis
that its cleaning services are uniquely efficient.

          Our court has previously found there to be a threat of
irreparable harm and enjoined a defendant from working for a
competitor even though the defendant offered to limit customer

-16-

contacts and not make use of the plaintiff's confidential information. National Business Services, Inc. v. Wright, 2 F. Supp. 2d 701 (E.D. Pa. 1998).  There, the plaintiff sold information products and services in print and electronic form to the advertising specialty and promotional product industry.  Id. at 702.  The defendant was employed by the plaintiff for approximately three years.  Id.  She entered into an employment agreement which restricted her from soliciting the plaintiff's customers, competing with the plaintiff, or disclosing any of the plaintiff's confidential information.  Id. at 704.  The defendant's duties with the plaintiff included internet sales to distributers, collecting customer feedback on products, and attending quarterly management meetings regarding internet products.  She had access to customer information, such as which customers had stopped purchasing the plaintiff's products and why.  Id. at 705.  She also had relationships with many of the plaintiff's customers and potential customers.  Id.

        The defendant left the plaintiff's employment to work for a competitor, performing sales and marketing duties.  Id. at 706.  The court enjoined the defendant from working at the plaintiff's competitor, even though the defendant stated that she would limit her customer contacts and refuse to make use of the defendant's confidential information.  Id. at 708.  The court reasoned that the defendant's "every decision would be informed by the information she acquired at" the plaintiff.  Id.  It also noted that "[e]ven if [the defendant] did not have direct contact

with customers, [the competitor] could publicize its employment
of [the defendant] in order to capitalize on [the plaintiff's]
goodwill." Id.  The court found that this "potential injury to
[the plaintiff's] goodwill and the potential use of [the
plaintiff's] confidential information constitute[d] irreparable
harm." Id.

        Similarly, Healthcare has established that they would
be irreparably harmed if we do not preliminarily enjoin Konopka
and Fay, who were two of its former high ranking employees, from
working at Senova or another competitor that provides
housekeeping, laundry, linen, or food services for healthcare
institutions in New York or Connecticut.  Prohibiting them from
soliciting Healthcare's clients would not be sufficient to
protect Healthcare.  Fay and Konopka had already promised
Healthcare upon leaving that they would not solicit customers but
did so anyway, both at Glengariff and West Hartford, and possibly
at Notre Dame as well.  We do not see how it would be any
different now if we merely enjoined them from soliciting
customers.

        As in National Business Services, every decision Fay
and Konopka will make at Senova will be informed by their many
years at Healthcare.  By being present at sales meetings as
Senova employees, even though they allege they did not
participate, they have already harmed Healthcare and breached
their employment contracts.  Their presence helped Senova
establish goodwill, a crucial part of any sale.  Healthcare was

-18-

forced to reduce the price of one of its contracts by $30,000 after one of these meetings.  Further, their roles at Senova will allow Senova to capitalize on the goodwill they created while employed at Healthcare.  As noted above, Fay and Konopka are being paid relatively high salaries, $125,000 and $150,000 respectively.  Konopka also has the title of Vice President of Marketing.  Senova has used them in the past to compete against Healthcare, and it is unlikely that it will not use them in the future for the same purpose without the existence of a preliminary injunction.

The restrictive covenants prohibit Fay and Konopka from working for any competitor of Healthcare within the continental United States for two years after the termination of each one's employment.  The two-year time period is reasonable.  See Worldwide Auditing Servs., Inc. v. Richter, 587 A.2d 772, 776 (Pa. Super. Ct. 1991).  Although Healthcare operates in 49 states, Fay and Konopka only worked in New York and Connecticut. Accordingly, they are only privy to Healthcare's confidential information in New York and Connecticut, and they only know Healthcare's clients in these states.  Restricting them from the entire continental United States would be too broad and unnecessary to protect Healthcare.

In Pennsylvania, courts may "blueline" restrictive covenants "in order to enforce only those provisions that are reasonably necessary for the protection of the employer." Wellspan Health v. Bayliss, 869 A.2d 990, 996 n.2 (Pa. Super. Ct.

-19-

2005) (citations omitted).  We will blueline the restrictive covenants entered into by Fay and Konopka so that they are only precluded from working for Senova and other competitors which service senior living facilities and nursing homes in New York and Connecticut.  This encompasses the other restrictive covenants because if Fay and Konopka cannot compete with Healthcare, they cannot solicit clients of Healthcare.

With these restrictions, the grant of a preliminary injunction will not result in greater harm to Fay and Konopka than the denial of a preliminary injunction would cause to Healthcare.  Fay and Konopka voluntarily left Healthcare, with full knowledge of the restrictive covenants and the potential for Healthcare to enforce them.  See Nat'l Bus. Servs., 2 F. Supp. 2d at 709.  Recognizing the breach of contract, they were not honest with Healthcare about what they intended to do after their resignations.  Fay and Konopka are still free to work in related industries, such as cleaning services for commercial office buildings, which is what they had originally told Healthcare that they were planning to do and can engage in business similar to Healthcare with any company not doing business in New York or Connecticut.

Finally, the public interest favors enjoining Fay and Konopka.  They admit to having violated their covenants not to compete, and while they do not admit to having solicited clients of their former employer, they certainly have done so.  The

public interest is served by discouraging "the disavowal of freely contracted obligations."  Id. (citation omitted).