IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HEALTHCARE SERVICES GROUP, INC. :          CIVIL ACTION
                                :
            v.                  :
                                :
TIMOTHY FAY, et al.             :          NO. 13-66


MEMORANDUM


Bartle, J.                                      May 22, 2013

        Plaintiff Healthcare Services Group, Inc.
("Healthcare") has sued Timothy Fay ("Fay"), Richard Konopka
("Konopka"), and The Senova Group ("Senova")[1] for breach of
employment contracts, misappropriation of trade secrets under 12
Pa. Cons. Stat. Ann. § 5301 et seq., tortious interference with
business relations, and tortious interference with contractual
relations.  Fay and Konopka are former employees of Healthcare
and are now working for Senova.

        We have subject matter jurisdiction under 28 U.S.C.
§ 1332(a).[2]  Before the court is the motion of Healthcare for

_____

1.  According to its answer, The Senova Group is a fictitious
name for Janova Healthcare Services, LLC ("Janova"), a Delaware
limited liability company transacting business and maintaining a
regular place of business in New York City.

2.  Healthcare is incorporated and has its principal place of
business in Pennsylvania.  Fay is a citizen of New York, and
Konopka is a citizen of Connecticut.  As noted above, Senova is a
fictitious name for Janova, which is incorporated in Delaware
with its principal place of business in New York.  The sole
member of Janova is Lenova Holdings, LLC, a Delaware limited
liability company with its principal place of business in New
                                              (continued...)

preliminary injunctive relief.  The court held an evidentiary hearing on the motion and now makes the following findings of fact and conclusions of law.

I.

Healthcare provides contract food service, dining, housekeeping, and laundry services to clients operating senior living facilities and nursing homes in 49 states.  Fay was a Senior District Manager at Healthcare, and Konopka was a Regional Manager.  In 2010, 2011, and 2012, in exchange for the right to purchase Healthcare's stock at a discount, Fay and Konopka executed employment agreements which prohibited them from competing with Healthcare for a two-year period in the continental United States, soliciting Healthcare customers for a period of eighteen months, soliciting clients on accounts for which Fay or Konopka were responsible for a period of two years, or accepting employment related to housekeeping, linen, and/or food services by any facilities in which they worked for a period of two years.  Healthcare alleges that Fay and Konopka breached the following covenants in their employment agreements:

> **A. Covenant Not to Compete**.  During the term of your employment, and for a period of twenty-four (24) months after your employment has terminated, for any reason, you will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust,

---

2.  (...continued)
York.  The sole member of Lenova Holdings, LLC is Novack Corporation, a California corporation with its principal place of business in California.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

joint venture, partnership, or other business entity, directly or indirectly, carry on or be engaged or interested in (whether as employee, sole proprietor, partner, consultant, or owner,) any housekeeping, laundry, linen, and/or food service business, in any form whatsoever, which services health care institutions within the continental United States.

**B. Covenant Not to Solicit Clients or Accounts**. For a period of eighteen (18) months after your employment has been terminated, for any reason, you will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, solicit or accept any housekeeping, laundry, linen, and/or food service business or any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the Company within eighteen (18) months, of your separation from the Company (this covenant shall not apply to Account Managers).

**C. Covenant Not to Solicit Clients or Accounts For Whom You Were Responsible**. For a period of two (2) years after your after your employment has been terminated, for any reason, you will not, either solely or jointly with, or as manager or agent for, any person, corporation, trust, joint venture, partnership, or other business entity, directly or indirectly, solicit or accept any housekeeping, laundry, linen, and/or food service business or any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the Company within two (2) years of your separation from the Company, for any reason, and for whom you were responsible.

**D. Cross-Over Employment Covenant**. At no time during your employment, and for a period of two (2) years after your employment has terminated, for any reason, you will not accept any employment related to housekeeping, laundry, linen, and/or food services by any facilities in which you worked, or were directly responsible for, within business of any clients or accounts that were clients or accounts (or legal successors to clients or accounts) of the

Company within two (2) years of your
separation from the Company, regardless of
any changes of ownership or affiliation of
such facilities.

**E. Employment by Competing Contractors
Covenant.**  At no time during your employment
or for a period of two (2) years after your
employment has terminated, for any reason,
will you accept any employment related to
housekeeping, laundry, linen, and/or food
services at any facility in which you have
worked, or been directly responsible for,
within two (2) years of your separation from
the Company.  You acknowledge that this
provision, when combined with Paragraph ... D
above, may restrict your future employment,
regardless of whether that employment is by:
(1) the facility itself; (2) an entity that
owns, operates, or manages the facility; (3)
another contractor; and (4) self-employment
by you as an independent contractor.[3]

Fay and Konopka resigned their positions with
Healthcare on September 6, 2012 and October 10, 2012,
respectively.  Each informed Kevin McCartney, Divisional Vice
President for Healthcare's Northeast Division, that he was
accepting employment with Senova.  They told McCartney that their
employment activities for Senova would be limited to Senova's
commercial business, as opposed to its healthcare business, and
that they would therefore be in compliance with the restrictive
covenants in their employment agreements.

Fay had been employed at Healthcare for ten years.  As
a Senior District Manager, he was responsible for its operational
performance in a number of senior living facilities with which it
had contracts.  His duties included overseeing Healthcare's

---

3.  The restrictive covenants in those employment agreements were
identical for 2010, 2011, and 2012.

budgets and financials, including its profit margins, at these locations. While he did not have direct sales responsibilities, he would pass along any helpful information learned in his operational capacity to those employees with sales responsibilities. He would also go to four or five sales meetings each year. His territory included facilities mainly in New York but also a few in Connecticut.

Konopka had worked at Healthcare for twelve years. As a Regional Manager, he was involved in customer contact and marketing in New York and Connecticut. He participated in sales visits to potential clients and knew which facilities Healthcare was trying to develop as clients.

Healthcare's sales team acquires accounts through some cold-calling but mostly through its relationships with its current clients. For example, when an administrator at one client leaves for another healthcare facility, Healthcare tries to continue the relationship with the administrator and do business with the new facility. In a first contact with a potential client, someone from Healthcare obtains information on how the potential client is currently operating and then walks through the facility with the administrator to discuss how Healthcare would change operations. When Healthcare is unsuccessful in the attempted solicitation of a potential client, it will try to solicit the potential client again in three to six months. Records are kept of these attempts, and all district managers and regional managers have access to these records.

These records also contain information about the decisionmakers at various facilities. This kind of information is valuable because it helps Healthcare to streamline its sales process. Nonetheless, a diligent person could search the phonebook or internet for a list of healthcare facilities in a region and call those facilities to determine who makes decisions regarding cleaning, laundry, and dining services at each. Similar information is also available in government records because healthcare facilities submit cost reports to the various states where they are located regarding how much they spend annually by department.

Healthcare's purpose in requesting high level employees such as Fay and Konopka to sign restrictive covenants is to prevent such individuals from using their knowledge of Healthcare's systems and procedures to solicit both existing Healthcare clients and potential Healthcare clients for a competitor. These systems and procedures include budget, financing, and marketing information, as well as methods used to make its services efficient and profitable. Healthcare markets itself to potential clients as having a unique cleaning system that is more efficient than that of its competitors. This cleaning system is written down and distributed to the employees who do the cleaning. Healthcare also markets itself to potential clients by entering contracts that allow clients to cancel its services within sixty to ninety days. Although Healthcare attempts to keep its contracts with clients confidential, anyone,

including Senova employees, could seek to obtain a copy of the contract from the Healthcare client.

Konopka and Fay both told Senova's Chief Operating Officer, Mordy Levy, about the restrictive covenants they had signed with Healthcare before they were hired by Senova. Nonetheless, Konopka was hired to be the Vice President of Marketing at Senova at a salary of $150,000 per year. Despite his title and salary, he does not now have sales responsibilities and is currently acting as an operations manager to help Senova make its healthcare operations more competitive in the industry.

Konopka explained that his current duties at Senova simply involve visiting two of Senova's long-term care facility clients, to ensure that they are clean, that the administrators are happy, and that the Senova managers at the facilities are doing their jobs. When he first was employed by Senova, its sales person, Sam Hartstein ("Hartstein"), reported to Konopka. They would discuss sales and operations, although they rarely saw each other because they each spent most of their time traveling to clients and potential clients. Their collaboration was over the phone. Hartstein left Senova on April 17, 2013.

When Fay was hired, he was under the impression that he would oversee managers at a number of healthcare facilities. Although his salary is $125,000 per year, he testified that he is responsible for the management of only two healthcare facilities on a regular basis, Notre Dame Convalescent Home ("Notre Dame") in Norwalk, Connecticut and Livingston Hills Nursing and

Rehabilitation Center in Hudson, New York and for fielding
occasional questions, via telephone, from a facility in
California.  Fay only spends four hours each day at any facility.
The rest of his work day is spent driving to and from them.  Fay
also supervises John Kalba, a manager at Senova who also came
from Healthcare, where he was an account manager.

Fay admits that on one occasion as a Senova employee he
accompanied Hartstein to a place of business of one of
Healthcare's clients, Glengariff Healthcare Center ("Glengariff")
on Long Island, New York.  Healthcare's contract with Glengariff
only involved dietary services, which Senova does not provide.
Hartstein was there to make a proposal to Glengariff for Senova
to perform its cleaning services.  According to Fay, he went to
Glengariff simply to talk to the owner of the nursing home,
Sanjay Ahuja ("Ahuja"), who also owned a cleaning supply
business.  Fay was interested in buying cleaning supplies from
Ahuja for Senova and simply discussed this subject with him.
Even if Fay was not present when Hartstein discussed with Ahuja
the possibility of Glengariff using Senova's cleaning services,
part of sales is forming goodwill with potential clients, which
is what Fay did here.  Moreover, although Senova could not have
captured Healthcare's dietary business, Fay's visit to Glengariff
served to undermine any effort on the part of Healthcare to
obtain a contract for Glengarrif's cleaning business.  When Fay
was at Glengariff, he saw Jen Andross, a former coworker from

Healthcare, in the parking lot.  Speaking with her, he said, "hey don't tell your boss I'm here."

Fay and Konopka admit that they were involved in discussions with another customer of plaintiff, West Hartford Health and Rehabilitation Center ("West Hartford") in Connecticut.  Konopka visited West Hartford because Hartstein had a meeting there and asked Konopka to accompany him.  Fay also attended the meeting.  Hartstein presented the sales proposal while Fay and Konopka were in the room.  While Konopka apparently had not reviewed the proposal, he knew the two administrators to whom Hartstein was presenting the proposal from his time at Healthcare.  Konopka was the person at Healthcare who had initiated Healthcare's relationship with West Hartford in 2011. Sometime after this meeting that Hartstein, Fay, and Konopka attended at West Hartford, Healthcare was forced to reduce the price of its contract with West Hartford by $30,000 in order to keep it as a client.

In addition to Glengariff and West Hartford, Fay testified that he went to a few other sales meetings while at Senova but stated that he could not recall the names of those facilities.  According to Fay, none was a current client of Healthcare.

Since Fay and Konopka have been at Senova, Senova has also obtained a new client, Notre Dame, which Konopka had unsuccessfully solicited when he was at Healthcare.  Hartstein solicited Notre Dame for Senova.

After Fay and Konopka left to work for Senova, Healthcare shored up its client relationships because it wanted to ensure that Senova did not take any of its clients. Indeed, a number of Healthcare's clients in New York and Connecticut called Healthcare after Fay and Konopka left for Senova. All staff had meetings and contacts with existing clients to see if they had been contacted by Senova. This took time away from the usual business of the Healthcare sales and marketing team, which would ordinarily include soliciting new business.

## II.

Healthcare requested the following specific relief in its motion for a preliminary injunction: (1) to enjoin Fay, Konopka, and Senova from using or disclosing any of Healthcare's trade secrets or confidential or propriety business information; (2) to enjoin Fay and Konopka from contacting, directly or indirectly, any person or entity that was a client of Healthcare while they worked there; (3) to enjoin Fay and Konopka from accepting or maintaining employment with, or providing services to or on behalf of, any competitor of Healthcare, including Senova; and (4) to enjoin Senova from continuing to employ Fay and Konopka.

At the hearing, Healthcare explained that it was simply requesting the preliminary injunction against Fay and Konopka in connection with its breach of contract claim. It was not pressing at this time its request to have Senova enjoined from using or disclosing any of Healthcare's trade secrets or

confidential or propriety business information.  As to its
request to enjoin Senova from continuing to employ Fay and
Konopka, it viewed it simply as the inverse of its request to
enjoin Fay and Konopka from working at Senova.

Fay and Konopka have agreed to be enjoined from using
any of Healthcare's confidential and/or proprietary information[4]
and from directly or indirectly contacting or soliciting any
known customers of Healthcare until June 16, 2014.  However, they
oppose any injunction which would prevent their employment with
Senova or any competitor of Healthcare for any period of time.

III.

Healthcare has the burden of persuasion, by a clear
showing, since a preliminary injunction is a drastic remedy.
Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal
quotation marks and citation omitted).  To be enforced, a
covenant not to compete must be "reasonably necessary for the
protection of the employer's protectible [sic] business
interests.'"  Hess v. Gebhard & Co., Inc., 808 A.2d 912, 920 (Pa.
2002).

4.  While Fay and Konopka have agreed to be enjoined from using
any of Healthcare's confidential information, Rule 65(d)(1) of
the Federal Rules of Civil Procedure requires any injunction to
"state its terms specifically" and "to describe in reasonable
detail the... act or acts restrained...."  There was no specific
evidence in the record on the subject of confidential
information.  Moreover, Healthcare is not pursuing at this time
preliminary injunctive relief under the Pennsylvania Uniform
Trade Secrets Act, 12 Pa. Cons. Stat. Ann. § 5301 et seq.

A preliminary injunction should be granted only if the plaintiff can establish: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). A preliminary injunction is inappropriate if the plaintiff fails to establish any element in its favor. P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005).

To establish a likelihood of success on the merits, the restrictive covenants must be enforceable. In Pennsylvania, valid restrictive covenants must be incident to the employment relationship, reasonably necessary for the protection of the employer, and reasonably limited in duration and geographic extent. Hess, 808 A.2d at 917; see also Zambelli Fireworks Mfg. Co., v. Wood, 592 F.3d 412, 424 (2010). At the evidentiary hearing, the defendants agreed that the employment agreements are supported by consideration and are valid. Defendants have also conceded that they have breached their employment contracts by going to work for Senova, a competitor of Healthcare. Accordingly, Healthcare must only establish that it will suffer irreparable harm if the preliminary injunction is denied, that granting the preliminary injunction will not result in greater

harm to Konopka and Fay, and that the public interest favors such relief.

The Pennsylvania Supreme Court explained the standard for irreparable harm in the context of a covenant not to compete in an employment agreement in <u>John G. Bryant Co. v. Sling Testing & Repair, Inc.</u>, 369 A.2d 1164, 1167 (Pa. 1977). The court provided:

> It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.... The covenant seeks to prevent more than just the sales that might result by the prohibited contact but also the covenant is designed to prevent a disturbance in the relationship that has been established between [the employees] and their accounts through prior dealings. It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.

Accordingly, in Pennsylvania, "interference with customer relationships satisfies the irreparable harm requirement." <u>Coventry First, LLC v. Ingrassia</u>, No. 05-2802, 2005 U.S. Dist. LEXIS 13759 (E.D. Pa. July 11, 2005) (citing <u>John G. Bryant Co.</u>, 369 A.2d at 1167). "Indeed, as one court has stated, 'because the violation of a covenant not to compete results in interference with customer relationships causing nonquantifiable damages, such covenants are prima facie enforceable in equity.'" <u>Id.</u> (quoting <u>Sparks Tune-Up, Inc. v.</u>

<u>White</u>, No. 89-664, 1989 U.S. Dist. LEXIS 4216, at *4 (E.D. Pa. Apr. 18, 1989)).

Fay and Konopka urge that we follow <u>Advanced Fox Antenna v. Csaszar</u>, No. 98-5626, 1999 U.S. Dist. LEXIS 1218 (Jan. 29, 1999).  There, the defendant had signed an employment agreement with the plaintiff which included a covenant not to compete as well as a covenant not to solicit clients of the employer or use the employer's confidential information.  <u>Id.</u> at *2.  The defendant quit her job with the plaintiff and accepted a new job with a competitor.  <u>Id.</u> at *3.  The plaintiff sued and moved for a preliminary injunction prohibiting the defendant both from working at the competitor and from soliciting the plaintiff's clients or using the plaintiff's confidential information in any way.  <u>Id.</u>  The court granted the motion in part and enjoined the defendant from soliciting her former employer's clients or disclosing her former employer's confidential information but denied it in part by refusing to enjoin her from working at a competitor.  <u>Id.</u> at *13.

Fay and Konopka would like us to follow <u>Advanced Fox Antenna</u> and simply enjoin them from soliciting Healthcare's clients or using Healthcare's confidential information while allowing them to continue to work at Senova.  However, the situation here is different from that in <u>Advanced Fox Antenna</u>. There, the plaintiff had offered no evidence that the defendant had either solicited its customers or disclosed any confidential information to her new employer.  In contrast, Fay and Konopka

-14-

concede that they attended meetings at clients of Healthcare with a member of Senova's sales team. While Fay and Konopka contend that these meetings do not constitute solicitation of Healthcare's clients, we disagree. By going to sales meetings at the clients of Healthcare, whom they knew from their work there, Fay and Konopka were clearly establishing goodwill for Senova, a key component of solicitation.

Similarly, Fay and Konopka also rely on <u>Rollins Protective Services Co. v. Shaffer</u>, 383 Pa. Super. 598 (Pa. Super. Ct. 1989). There, the Superior Court upheld the denial of a preliminary injunction when employees with employment agreements containing covenants not to compete went to work for a competitor of the plaintiff, which, like plaintiff, was a security company. <u>Id.</u> at 602. The court held that the defendants failed to prove that there was a threat of irreparable harm because they had not proven any unwarranted interference with customer relations. <u>Id.</u> The present case is inapposite since the plaintiff established at the hearing that Fay and Konopka both went to sales meetings at clients of Healthcare, thus interfering with Healthcare's customer relations.

This was also the situation in <u>Harsco Corp. v. Klein</u>, 576 A.2d 1118 (Pa. Super. Ct. 1990), on which the defendants rely. There, the defendant worked at plaintiff's subdivision, Patent Scaffolding Company, as the national sales manager. <u>Id.</u> at 1119. Patent Scaffolding Company was in the business of marketing concrete shoring and forming scaffolding systems and

related products and services.  Id.  The defendant had signed a
covenant not to compete in an employment agreement.  Id. at 1120.
He left Patent Scaffolding Company to work for The Burke Company,
which was in direct competition with Patent Scaffolding Company
in the Pittsburgh area.  Id.  The court found that irreparable
harm had not been proven because there was no uniqueness in the
former employee's product or services that could be characterized
as confidential.  Id. at 1121.  Further, the employee did not
deal directly with customers at the time he resigned from his
former employer, and the customers in the building trade are
known to all.  Id.

        Fay and Konopka likewise argue that "[t]here are no
scientific or revolutionary processes involved" in Healthcare's
business, which consists of cleaning bathrooms, common areas and
resident/patient rooms, buying and preparing food for mass
distribution, washing clothes, and changing beds.  However,
unlike the defendant in Harsco, Fay and Konopka were high level
employees who worked directly with clients when they were at
Healthcare.  Furthermore, Healthcare has established that Fay and
Konopka, while at Senova, met with clients of Healthcare, to its
detriment.  While its business is perhaps not highly scientific,
Healthcare does market itself to potential clients on the basis
that its cleaning services are uniquely efficient.

        Our court has previously found there to be a threat of
irreparable harm and enjoined a defendant from working for a
competitor even though the defendant offered to limit customer

contacts and not make use of the plaintiff's confidential
information. National Business Services, Inc. v. Wright, 2 F.
Supp. 2d 701 (E.D. Pa. 1998). There, the plaintiff sold
information products and services in print and electronic form to
the advertising specialty and promotional product industry. Id.
at 702. The defendant was employed by the plaintiff for
approximately three years. Id. She entered into an employment
agreement which restricted her from soliciting the plaintiff's
customers, competing with the plaintiff, or disclosing any of the
plaintiff's confidential information. Id. at 704. The
defendant's duties with the plaintiff included internet sales to
distributers, collecting customer feedback on products, and
attending quarterly management meetings regarding internet
products. She had access to customer information, such as which
customers had stopped purchasing the plaintiff's products and
why. Id. at 705. She also had relationships with many of the
plaintiff's customers and potential customers. Id.

The defendant left the plaintiff's employment to work
for a competitor, performing sales and marketing duties. Id. at
706. The court enjoined the defendant from working at the
plaintiff's competitor, even though the defendant stated that she
would limit her customer contacts and refuse to make use of the
defendant's confidential information. Id. at 708. The court
reasoned that the defendant's "every decision would be informed
by the information she acquired at" the plaintiff. Id. It also
noted that "[e]ven if [the defendant] did not have direct contact

with customers, [the competitor] could publicize its employment
of [the defendant] in order to capitalize on [the plaintiff's]
goodwill."  Id.  The court found that this "potential injury to
[the plaintiff's] goodwill and the potential use of [the
plaintiff's] confidential information constitute[d] irreparable
harm."  Id.

       Similarly, Healthcare has established that they would
be irreparably harmed if we do not preliminarily enjoin Konopka
and Fay, who were two of its former high ranking employees, from
working at Senova or another competitor that provides
housekeeping, laundry, linen, or food services for healthcare
institutions in New York or Connecticut.  Prohibiting them from
soliciting Healthcare's clients would not be sufficient to
protect Healthcare.  Fay and Konopka had already promised
Healthcare upon leaving that they would not solicit customers but
did so anyway, both at Glengariff and West Hartford, and possibly
at Notre Dame as well.  We do not see how it would be any
different now if we merely enjoined them from soliciting
customers.

       As in National Business Services, every decision Fay
and Konopka will make at Senova will be informed by their many
years at Healthcare.  By being present at sales meetings as
Senova employees, even though they allege they did not
participate, they have already harmed Healthcare and breached
their employment contracts.  Their presence helped Senova
establish goodwill, a crucial part of any sale.  Healthcare was

forced to reduce the price of one of its contracts by $30,000 after one of these meetings.  Further, their roles at Senova will allow Senova to capitalize on the goodwill they created while employed at Healthcare.  As noted above, Fay and Konopka are being paid relatively high salaries, $125,000 and $150,000 respectively.  Konopka also has the title of Vice President of Marketing.  Senova has used them in the past to compete against Healthcare, and it is unlikely that it will not use them in the future for the same purpose without the existence of a preliminary injunction.

The restrictive covenants prohibit Fay and Konopka from working for any competitor of Healthcare within the continental United States for two years after the termination of each one's employment.  The two-year time period is reasonable.  <u>See Worldwide Auditing Servs., Inc. v. Richter</u>, 587 A.2d 772, 776 (Pa. Super. Ct. 1991).  Although Healthcare operates in 49 states, Fay and Konopka only worked in New York and Connecticut.  Accordingly, they are only privy to Healthcare's confidential information in New York and Connecticut, and they only know Healthcare's clients in these states.  Restricting them from the entire continental United States would be too broad and unnecessary to protect Healthcare.

In Pennsylvania, courts may "blueline" restrictive covenants "in order to enforce only those provisions that are reasonably necessary for the protection of the employer."  <u>Wellspan Health v. Bayliss</u>, 869 A.2d 990, 996 n.2 (Pa. Super. Ct.

2005) (citations omitted).  We will blueline the restrictive
covenants entered into by Fay and Konopka so that they are only
precluded from working for Senova and other competitors which
service senior living facilities and nursing homes in New York
and Connecticut.  This encompasses the other restrictive
covenants because if Fay and Konopka cannot compete with
Healthcare, they cannot solicit clients of Healthcare.

With these restrictions, the grant of a preliminary
injunction will not result in greater harm to Fay and Konopka
than the denial of a preliminary injunction would cause to
Healthcare.  Fay and Konopka voluntarily left Healthcare, with
full knowledge of the restrictive covenants and the potential for
Healthcare to enforce them.  See Nat'l Bus. Servs., 2 F. Supp. 2d
at 709.  Recognizing the breach of contract, they were not honest
with Healthcare about what they intended to do after their
resignations.  Fay and Konopka are still free to work in related
industries, such as cleaning services for commercial office
buildings, which is what they had originally told Healthcare that
they were planning to do and can engage in business similar to
Healthcare with any company not doing business in New York or
Connecticut.

Finally, the public interest favors enjoining Fay and
Konopka.  They admit to having violated their covenants not to
compete, and while they do not admit to having solicited clients
of their former employer, they certainly have done so.  The

public interest is served by discouraging "the disavowal of freely contracted obligations." Id. (citation omitted).